```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
                       06-CV-2725(JMR/FLN)
```

Philip David Schaub            )
                               )
     v.                        )
                               )        ORDER
The County of Olmsted,         )
Olmsted County Adult           )
Detention Center; Steven       )
VonWald; Bernard Sizer;        )
John Does 1-6                  )

Plaintiff was imprisoned at the Olmsted County Adult Detention Center ("ADC") in 2003. He claims he was injured there as a result of the ADC's failure to accommodate his physical condition. He seeks damages from Olmsted County; the ADC; Steven VonWald, then-ADC director; Bernard Sizer, his probation officer; and several unnamed defendants.[1]

Defendants move for summary judgment. Their motion is denied.

I. Background[2]

Plaintiff has been paraplegic since 1984. In November 2002, he pleaded guilty to a crime, and was sentenced to 180 days in the Olmsted County Adult Detention Center. He began his sentence on

---

[1] Plaintiff's memorandum opposing summary judgment identifies two of the John Doe defendants as Captain Stacy Sinner and Sergeant Alfredo Castellanos. He has not amended his complaint to name these defendants. No other John Doe defendants have been identified.

[2] Because this is a motion for summary judgment, all disputed facts are viewed in the light most favorable to plaintiff, the non-moving party.

March 4, 2003.

The ADC has accommodated other paraplegic inmates in the past, housing them in the general population. Plaintiff was assigned to a cell ADC considered handicapped-accessible. Plaintiff immediately raised concerns about the cell. He told jailors the shower was not accessible, and the toilet was so low he risked falling when transferring between it and his wheelchair. He also said the hard metal bed might cause pressure sores. The ADC gave him an additional mattress, and granted him two extra hours of work-release to allow him to use his home shower and toilet.[3]

Within two weeks, plaintiff began developing pressure sores on his heels due to edema in his legs. He asked authorities to provide him with something he could use to elevate his legs to reduce the swelling. The ADC gave him extra pillows. The pillows did not raise his legs high enough. They also prevented him from changing position, which is critical to avoiding pressure sores. Plaintiff was told he needed a doctor's note to obtain further accommodations.

Because the ADC does not provide medical care to inmates on

---

[3] Sergeant Castellanos' intake notes state: "Detainee Schaub presented many obstacles regarding shower and toilet use. I was to the point of placing him in the special management unit, so medical staff could handle all of his needs, when I presented him with that option, he became more cooperative and willing to be creative." (Affidavit of Stacy Sinner Ex. C.)

work-release,[4] plaintiff saw his personal physician, Dr. Katherine Stolp, at the Mayo Clinic. Dr. Stolp was concerned about the pressure sores. On April 7, 2003, she wrote to ADC Director VonWald saying plaintiff required "a padded toilet seat, adequate accessible shower with padded shower bench, and a mechanism for elevating his legs as well as a pressure-relieving mattress on his bed." Dr. Stolp said that if the ADC did not provide these accommodations, she would "advocate for him to be on home electronic monitoring." VonWald recalls receiving this letter and passing it along to his staff.

Ten days passed before Dr. Robin Molella, ADC's consulting physician, reviewed Dr. Stolp's letter. Because the ADC policy did not permit treatment of work-release inmates, Dr. Molella did not examine plaintiff. She noted in plaintiff's file, however, that "the bed situation is not optimal," and the proposed accommodations would be "extremely difficult to reliably provide" at the ADC. Meanwhile, the deputies who strip-searched plaintiff daily on his return from work-release observed that the flesh on plaintiff's feet was open and weeping.

On April 28, plaintiff sustained further injuries. For the first time, after nearly eight weeks of incarceration, plaintiff transferred himself to the toilet in his cell. When he attempted

---

[4] While this is an unwritten policy, defendants acknowledge its existence. (See Affidavit of Stacy Sinner at ¶ 4; Deposition of Steven VonWald at 17.)

3

to transfer back to his wheelchair, the wheelchair shifted, and he fell to the floor. The cell's only panic button was located above the bed, out of his reach. He shouted for help to no avail. After ten minutes, he was able to pull himself into his wheelchair and leave his cell. He told a deputy that he had fallen in his cell. ADC staff observed plaintiff's face was flushed and his leg was swollen. ADC staff released him so he could drive to the hospital.

The hospital examination revealed a shattered femur and a bruise deep in the tissue of plaintiff's right thigh. He was hospitalized for a week. The bruise developed into an open pressure sore on the back of his right thigh. Tests showed plaintiff's existing pressure sores and bladder were infected with staphylococcus and pseudomonas pathogens. Hospital staff changed his bandages twice a day.

Meanwhile, plaintiff asked for a sentence modification allowing home detention with electronic monitoring based on the ADC's inability to accommodate his medical needs. The prosecutor opposed the modification. The sentencing court wrote to ADC Director VonWald asking if the ADC could accommodate plaintiff's medical needs. On May 15, 2003, VonWald replied, saying the ADC could not provide a hospital bed, but would allow plaintiff to use additional mattresses and cushions. VonWald opined plaintiff could serve the remainder of his sentence at the ADC without risk to his medical condition. The court - the next day - denied plaintiff's

4

motion for home detention. The court's order incorporated VonWald's letter.

Plaintiff returned to the ADC on July 16, 2003, with a cast on his leg and open pressure sores on his thigh and heels. His broken leg cost him his job. As a result, he was no longer on work release. He was placed in the general population where he was entitled to ADC medical care.

On his first day back at the ADC, Nurse Patricia Crandall saw plaintiff and noted he required a catheter bag, wound dressings, a bed pad, a toilet raiser, a shower chair, raisers for his feet and head, and two mattresses, until a "new and thicker one" could be found. Crandall attempted to find these items. Plaintiff claims the nursing staff made no attempt to bathe him or change his wound dressings; instead, Crandall contacted an outside nursing agency about performing these services.

The next day, July 17, Dr. Molella saw plaintiff for the first time. This was his first ADC-physician exam since his incarceration on March 4. By this time, ADC nursing staff had fitted plaintiff's bed with two mattresses, foam wedges, and a sheepskin. Dr. Molella observed plaintiff's existing pressure sores and noted another "area of pressure" developing in his sacral region. She observed plaintiff's "extremely limited" ability to reposition himself in bed "due to the lack of grab bars of any kind." Her notes reflect plaintiff's condition as a "serious

issue" requiring "close observation." Dr. Molella's notes show she was not certain the accommodations provided by the ADC would be adequate. She recommended plaintiff be "repositioned hourly," and nursing staff provide "assistance with dressing changes as required."

Plaintiff was not seen by either a nurse or a doctor until July 23, five days later. During that time, he was not bathed, and his wound dressings were not changed. Plaintiff wrote daily notes to the nursing staff asking for help showering and changing his dressings. He received no response. He then asked a corrections officer to help him change his bandages. Sergeant Castellanos did not allow the officer to help him.

On July 22, plaintiff was visited by his probation officer, Bernard Sizer. He told Sizer of the difficulties he had in obtaining showers and wound care. Sizer promised plaintiff he would be showered the next day, and would receive showers and bandage changes twice a week thereafter. That same day, Anne Polikowsky, a nurse from an outside agency, examined plaintiff. She smelled a "strong odor" from one of his pressure sores. She also saw the need for a different wheelchair to prevent recurring edema. She approved giving plaintiff his first bi-weekly shower and wound dressing change.

The next day, July 23, plaintiff received his first bath and wound dressing change since returning to the ADC. At this time,

nursing staff observed that the large "area of pressure" noted by Dr. Molella on July 17 was becoming a pressure sore. Rather than treat the sore, they chose to wait for Dr. Molella's return the next day. Meanwhile, after plaintiff was bathed, his right hand and wrist began to swell, causing him considerable pain.

When Dr. Molella arrived on July 24, she detected a strong odor and saw plaintiff's hand and forearm were red and swollen. The swelling was later diagnosed as cellulitis, contracted from being bathed the day before. The "area of pressure" in plaintiff's sacral region had become a deep bruise through to the bone. Dr. Molella ordered that plaintiff be transported to the emergency room at St. Mary's Hospital. Dr. Molella charted her observations, saying:

> In [plaintiff's] current state we cannot provide the skin care[] and other skilled nursing support required to improve and manage his condition. In fact, it would be my recommendation given the decline in his health while here, that he not be returned to this institution at all. But, in the event that he must return[,] not until he is back to baseline mobility and his skin is fully intact. If he must be held for security reasons, he requires . . . a setting with special bedding and twenty-four hour nursing support.

ADC Nursing/Medical Notes at 4.

That same day, the sentencing court ordered plaintiff released from the ADC. Several days later, the court vacated the remainder of his sentence.

Plaintiff's problems, however, did not end with his release from the ADC. His infected pressure sores required follow-up

7

surgery and took four years to heal, during which time he experienced significant pain. His fractured femur, and its resulting pressure sore and infection, caused his right hip socket to deteriorate, resulting in a "floating leg." He suffers recurring bladder infections requiring antibiotic treatment. He has been bed-ridden for more than five years, and has developed symptoms of depression and anxiety.[5]

Plaintiff filed this action on July 29, 2006. Discovery is complete. Defendants move for summary judgment.

II. Analysis

Summary judgment is only appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986). The party opposing summary judgment may not rest upon the allegations in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 248-49.

1. Individual Claims Under 42 U.S.C. § 1983

The individual defendants argue they are entitled to summary judgment on the grounds of qualified immunity.

Government officials performing discretionary functions are

---

[5] Neither plaintiff nor defendants have submitted medical evidence or expert opinion as to plaintiff's current medical condition.

8

generally entitled to qualified immunity unless they violate clearly established constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The existence of qualified immunity is a question of law for the court. Hunter v. Bryant, 502 U.S. 224, 228 (1991).

The Supreme Court's recent decision in Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808 (2009), has freed district courts from the rigid analytic prescribed in Saucier v. Katz, 533 U.S. 194, 201 (2001). Nevertheless, the Court elects to use the Saucier formula, and finds plaintiff has asserted a clear violation of a constitutional right. The principle that deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's prohibition on cruel and unusual punishment is well-established. Estelle v. Gamble, 429 U.S. 97, 104 (1976).

To prevail on an Eighth Amendment claim, plaintiff must show that (1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it. Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004). Prison officials exhibit deliberate indifference when they "know[ ] of and disregard[ ]" a prisoner's serious medical needs. Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995). A jury may find a prison official knew of a prisoner's serious medical needs from circumstantial evidence, such as "the fact that the needs were obvious." Id. Where a prisoner's need for medical attention "would have been

obvious to a layperson," verifying medical evidence is unnecessary. Hartsfield, 371 F.3d at 457.

Defendants do not deny they knew plaintiff had serious medical needs.[6] Instead, they claim that after he returned to the ADC in July 2003, "[n]o one ignored his condition." According to defendants, plaintiff received "constant, continuing care" from ADC staff, and there "was no delay in treatment." (Def. Mem. at 13.)

This contention presents a clear question for the jury. In the Court's view, plaintiff's evidence is more than sufficient to present a question of fact as to whether defendants were deliberately indifferent to his serious medical needs.[7]

Plaintiff states that, on arrival at the ADC, he told staff he might develop pressure sores from having to sit or lie down on the hard surfaces in his cell. When sores did develop, he saw a doctor

---

[6] The Court would have no difficulty making such a finding, even absent this concession. Pressure sores are a serious risk associated with paraplegia. Their prevention is a serious medical need. See Lawson v. Dallas County, 286 F.3d 257, 260 (5th Cir. 2002). Plaintiff's physician warned the ADC of the possibility of plaintiff developing pressure sores, and the ADC's own doctor advised the nursing staff of it thereafter.

[7] Despite the County's failure to brief an individualized defense for each named defendant, the Court considers maintaining this lawsuit against probation officer Bernard Sizer to be extremely problematic. Viewed most favorably to plaintiff, the evidence shows Sizer visited plaintiff once at the ADC, and promised - accurately - that plaintiff would receive a shower and wound dressings change the next day. In the Court's view, these facts are not sufficient to show either that Sizer knew of, or that he deliberately disregarded, defendant's serious medical needs. As plaintiff has failed to show Sizer committed any constitutional violation, Sizer is entitled to summary judgment.

two weeks later. His doctor wrote to defendant VonWald and advised him of plaintiff's substantial risk of serious injury - developing pressure sores - if he were not provided certain accommodations. Those accommodations were not provided. And as predicted, plaintiff's condition worsened. A jury believing this testimony can well find an Eighth Amendment violation.

These problems did not abate. When plaintiff returned to the ADC after breaking his leg, there were more substantial risks of serious harm if his medical needs were not met. On these facts, a jury could well-find plaintiff needed - and defendants did not provide - daily care to prevent continued pressure sore development and infection to his existing wounds.

Nurse Crandall and Dr. Molella understood these issues. Dr. Molella directed nursing staff to assist plaintiff with dressing changes "as required," and to "close[ly] observ[e]" his developing sacral "area of pressure." Yet despite this instruction and plaintiff's repeated requests, he received no medical attention for five days. The jury could also find his care was neglected during those five days, causing his condition to deteriorate with consequent hospitalization and follow-up treatment.

There is evidence from which a jury could find the ADC staff ignored the recommendations of Drs. Stolp and Molella, and failed to provide care for plaintiff. A delay in treatment, coupled with knowledge of an inmate-patient's suffering, can support a finding

11

of an Eighth Amendment violation.  <u>Boyd</u>, 47 F.3d at 969; <u>Patterson v. Pearson</u>, 19 F.3d 439, 440 (8th Cir. 1994).

As the constitutional right to medical treatment was clearly established, the Court finds the remaining defendants are not entitled to qualified immunity.

2. <u>Monell Claims</u>.[8]

Plaintiff claims Olmsted County is liable for constitutional violations, as contemplated by <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 690-91 (1978).  The Supreme Court has held a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." <u>Id.</u> at 694.  Rather, a municipality is responsible only if an injury is inflicted because of "execution of a governmental policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." <u>Id.</u>

Under <u>Monell</u>, there must be an identified municipal policy or custom.  <u>Dick v. Watonwan County</u>, 738 F.2d 939, 943 (8th Cir. 1984).  A "policy" is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who

---

[8] With respect to the Section 1983 claims, defendants' opening brief advanced the sole argument that there was no constitutional violation; it did not address plaintiff's <u>Monell</u> claims.  As a result, plaintiff, understandably, did not brief the <u>Monell</u> claims in response.  Defendants raised the issue for the first time in their reply brief.  As the Court's Local Rules permit only three briefs, the Court, in its discretion, has opted to consider these issues as if they had been properly raised by defendants in their opening brief.

12

has final authority regarding such matters." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999). The policy must be the "moving force behind the constitutional violation." Id.

Here, plaintiff offers the ADC's written policy #6-1, revised February 3, 2003 (Exhibit A, Affidavit of Captain Stacy Sinner). Under this policy, "the Health Care Staff will make determinations" about what medical care to provide. Defendant VonWald acknowledges exercising no oversight of the health care staff or their treatment decisions. (VonWald Dep. 40-41.) On this evidence, there is an unresolved question of fact as to whether VonWald's failure to oversee the nursing staff was the "moving force" behind the delay in treating plaintiff's wounds and pressure sores on his return to the ADC in July.[9]

Defendants admit policy #6-1 did not apply to plaintiff during his first two months at the ADC. At that time, plaintiff was under defendants' acknowledged, but unwritten, policy of denying ADC health care to all work-release inmates.

On these facts, there is a material question of fact as to whether the ADC's unwritten policy barring medical care to work-release inmates was the "moving force" behind plaintiff's injuries during his first two months in the ADC. Monell, 436 U.S. at 694. A reasonable jury might find such a blanket denial led to an Eighth

---

[9] The record discloses no explanation for the ADC nurses' acknowledged failure to bathe plaintiff and change his dressings.

13

Amendment violation.  See Szabla v. City of Brooklyn Park, 486 F.3d 385, 390 (8th Cir. 2007).  Alternatively, even if the jury found the no-treatment policy facially lawful, it could find the policy is tantamount to deliberate indifference[10] to work-release inmates' Eighth Amendment rights.

Accordingly, defendants' motion for summary judgment is denied as to plaintiff's Monell claims.

### 3. Title II Americans with Disabilities Act Claims

Plaintiff also claims the County and the ADC discriminated against him based on his disability, in violation of Title II of the Americans with Disabilities Act.  42 U.S.C. § 12132.  It is undisputed that Title II applies to the ADC's programs and services.  See Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 209-10 (1998).

To establish this prima facie case, plaintiff must show (1) he is a qualified individual with a disability; (2) he was denied the benefits of a public entity's service or program, or otherwise discriminated against; and (3) the denial or discrimination was based on his disability.  Randolph v. Rogers, 170 F.3d 850, 858 (8th Cir. 1999).  Defendants Olmsted County and the ADC admit they are public entities and plaintiff is a qualified individual with a disability; but they dispute the remaining elements.  To survive

---

[10] In this context, "deliberate indifference" means the County and ADC policymakers made a "deliberate choice to follow a course of action . . . from among various alternatives."  Szabla, id.

14

summary judgment, therefore, plaintiff must give evidence showing he was denied the benefits of ADC's services or programs, or otherwise discriminated against, because of his disability.

Disabled individuals are denied the benefit of a public entity's programs, activities, or services if they do not receive "meaningful access" to those services. Id. Conduct which establishes an Eighth Amendment violation may also state a claim under Title II. See United States v. Georgia, 546 U.S. 151, 157 (2006) (finding it "plausible that the alleged deliberate refusal of prison officials to accommodate [paraplegic inmate's] disability-related needs in such fundamentals as mobility, hygiene, [and] medical care" violated Title II). This may occur when the public entity's facilities are inaccessible or unusable. See 28 C.F.R. § 35.149.

No one disputes the toilet, shower, and panic button in plaintiff's cell were physically inaccessible to him because of his disability. This raises a disputed question of fact appropriate for a jury's determination as to whether the ADC's modifications – in permitting plaintiff to attend to his hygiene at home, or rely on the nursing staff to bathe him – were reasonable. Similarly, plaintiff's evidence presents an issue of fact as to whether he was excluded from appropriate medical care because of his disability. Accordingly, summary judgment for defendants on this claim is denied.

III. <u>Conclusion</u>

For the foregoing reasons, defendant Sizer's motion for summary judgment is granted. The remaining defendants' motion for summary judgment is denied.

Dated: September 9, 2009

<u>s/ James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States District Judge